636 P.2d 637

STATE of Arizona, Appellee,

v.

**Rufus Junior MINCEY, Appellant.**

No. 3283–2.

Supreme Court of Arizona,
In Banc.

Oct. 13, 1981.

Rehearing Denied Dec. 1, 1981.

Robert K. Corbin, Atty. Gen., Phoenix, Stephen D. Neely, Pima County Atty., D. Jesse Smith, Deputy County Atty., Tucson, for appellee.

Richard S. Oseran, Pima County Public Defender, Lawrence H. Fleischman, Asst. Pima County Public Defender, Elliot Glicksman, Tucson, for appellant.

GORDON, Justice:

Appellant Rufus Junior Mincey was convicted by a jury of murder, second degree, in violation of A.R.S. § 13–452, Count I; assault with a deadly weapon in violation of A.R.S. § 13–249, Count II; unlawful offer to sell narcotics in violation of A.R.S. § 36–1002.02, Count III; and unlawful possession of a narcotic drug for sale in violation of A.R.S. § 36–1002.01, Count IV.[1] He was sentenced to a term of not less than twenty-five years nor more than life for Count I; to a term of not less than ten nor more than fifteen years for Count II; to a term of not less than five nor more than fifteen years for Count III; and to a term of not less than five nor more than six years for Count IV, all sentences to run concurrently. We have jurisdiction pursuant to A.R.S. Const. Art. 6, § 5(3) and A.R.S. § 13–4031. The judgment of the trial court is reversed and remanded as to Count I; judgment is affirmed as to Counts II, III and IV.

This is the second time this case has been before us. The incidents giving rise to the instant appeal occurred in 1974. Following a jury trial, we reversed on two counts, *State v. Mincey*, 115 Ariz. 472, 566 P.2d 273 (1977) [hereinafter *Mincey I*], and the United States Supreme Court reversed on the remaining counts, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) [hereinafter *Mincey II*]. Because of the differences in evidence adduced at the second trial and the different issues in this appeal, we will restate the facts viewing

---

1. All Title 13 references in this sentence are to the Criminal Code previous to its revision in 1978.

the evidence in the light most favorable to upholding the verdict.

On October 28, 1974, a drug buy was arranged in Tucson between Undercover Officer Barry Headricks and Charles Ferguson by a police informant named Tom Read. Read introduced Headricks to Ferguson as Brian, a chemist. After this meeting, Ferguson went to appellant's apartment to set up the sale. Three other people were present in the apartment besides Ferguson and appellant: Deborah Johnson, apparently appellant's girlfriend, John Hodgman, and Carol Diane Greenwalt, Hodgman's girlfriend, all heroin users. Headricks, meanwhile, met with a team of undercover agents of the Metropolitan Area Narcotics Squad (Metro agents) to plan a buy-bust at appellant's apartment whereby Headricks would negotiate the sale, test the heroin, leave to get his "money man" (Undercover Agent Schwarz), return with the "money man" and other agents, and make the appropriate arrests and seizures of evidence.

After Ferguson arranged for the sale at appellant's apartment, he met Tom Read in the parking lot where both awaited the arrival of Headricks. During this time, Hodgman told appellant that Ferguson looked like someone who had been following him the previous week. It is disputed whether he called Ferguson a "guy" or a "narc". Hodgman then decided to go outside and look around. He took with him, on appellant's request, a trash bag to empty which the state maintains contained used drug paraphernalia (needles and cottons). While he was outside, he saw Ferguson talking with at least one other person, possibly two, and a car parked on the street with two people in it. When he returned to the apartment, he told appellant what he had seen.

When Headricks arrived, Ferguson brought him up to the apartment. Headricks was wired so as to transmit the proceedings in the apartment to the Metro agents and deputy county attorney who were stationed around the apartment complex. The sale was negotiated in the bathroom where Headricks conducted a field test of the heroin and where he apparently noticed that Ferguson was armed. Headricks then left saying that he would return with his "money man."

The Metro agents subsequently stationed themselves in the hallway near the door in such a manner so as not to be seen from inside the apartment. Headricks and Schwarz, dressed in street clothes, and with guns held at their sides, were in front of the door which was set in an alcove. Headricks knocked, and at this point the testimony and briefs conflict as to what subsequently occurred. The state maintains that Hodgman opened the door and made eye contact with one of the agents in the hall who was visible and wearing a badge; that Headricks announced "police" in a low voice and stepped inside; that Agent Schwarz tried to come in behind Headricks, but that Hodgman slammed the door on Schwarz' arm. Appellant maintains that Headricks knocked; that Hodgman approached the door and saw Headricks and another man through the peephole; that Hodgman opened the door and saw a third man peeking around the corner into the alcove and saw his head, shoulders and a gun held at chest level but no badge; that Hodgman then began to shut the door; that Headricks pushed against it and was able to get in; that no one either inside or outside the apartment, except Agent Schwarz, heard Headricks say anything about "police"; and that after Headricks' entry, the door caught Schwarz' right arm and that in his right hand he held a gun visible inside the apartment. Both agree that the remaining agents then rushed into the apartment and only then heard gunfire from the bedroom into which Headricks had gone to find appellant.

During the gun battle in the bedroom, appellant apparently fired seven shots, five of which hit Headricks, and Headricks fired six. The testimony is in dispute about who fired first. Appellant was wounded in the buttocks causing nerve damage. Deborah Johnson was wounded and crawled into the bedroom closet, and Charles Ferguson was

wounded in the head by a bullet which came through the bedroom wall as he was being held under arrest by Officer Fuller. Headricks then left the bedroom and collapsed in the living room, whereupon three of the Metro agents, Fuller, Morgan and Anaya, went into the bedroom. Others were placing John Hodgman and Diane Greenwalt under arrest in the living room and Charles Ferguson was on the floor, partially inside the bathroom, handcuffed and bleeding.

Agent Anaya testified at the pre-trial suppression hearing that during and after the shooting, he observed a gun lying near appellant's hand in the bedroom, a small automatic weapon that fell from Headrick's waist after his collapse in the living room, Headrick's revolver lying near his body, and a Hammerless .38 revolver he saw while entering the apartment which he said he thought belonged to Agent Schwarz, although he had taken it from Hodgman's hand during Hodgman's struggle with Schwarz after the entry into the apartment. Another of the Metro agents, Sgt. Wolfe, testified at trial that after the shooting, he observed a vial next to the wash basin in the bathroom as he was walking into the bedroom. After leaving the bedroom, he took a closer look and determined it was heroin.

Tucson Police Department policy required that the Metro agents not search or seize in the event of a homicide but await the arrival of the homicide investigative unit. Detective Reyna, heading that unit, arrived a few minutes after the shooting had stopped and the people in the apartment were under the control of the Metro agents. The length of time between the end of the shooting and Reyna's arrival at 3:28 p. m. was not clearly established at trial. The testimony is also in dispute as to how soon after his arrival the victims were removed from the scene.

After the removal of the victims, Reyna, two I.D. technicians, and a graphic arts specialist began photographing and filming the apartment and its contents. The apartment was also diagramed, and visible items were tagged, given identification numbers and subsequently removed. The state maintains that only after the "plain view" evidence was photographed and tagged did a "search" begin and that that was not until 7 p. m. The state also maintains that prior to any search commencing, Reyna asked a Deputy County Attorney if he would need a warrant and was informed that he would not, unless the police left the scene and later returned. He would, however, need a warrant for the search of an automobile in the parking lot. A telephonic search warrant was therefore obtained for the car. Reyna and the investigators left the apartment at approximately 1:30 a. m., after posting a guard, and returned later that morning to conduct what amounted to a four-day search.

Appellant's lease on the apartment expired at the end of October, at which time the Pima County Attorney's Office leased it, assumedly in preparation for the first trial. In October of 1978, that office again leased the apartment in preparation for the second trial. During the second occupancy, Detective Reyna recreated the trajectories of the bullets by examining the bullet holes that still existed and, according to the state, without using any of the evidence seized in 1974. A mock-up of the apartment was also prepared for the second trial independently, according to the state, of any notes or evidence seized in 1974.

Appellant raises fifteen issues on appeal which we will address in the following order.

1. Whether the lower court erred in instructing the jury that the law presumes that the defendant intended the consequences of his actions.

2. Whether the prosecutor's failure to provide exculpatory material that would have created a reasonable doubt in the first trial of appellant renders his second trial unconstitutional as a violation of double jeopardy.

3. Whether the lower court erred in refusing to sever the narcotics counts from the homicide and assault charges.

4. Whether the trial court committed reversible error in admitting into evidence items seized in a warrantless search of appellant's apartment.

5. Whether the trial court committed reversible error in allowing portions of Diane Greenwalt's testimony before the grand jury to be admitted into evidence at trial.

6. Whether the lower court erred in allowing the prosecutor to examine appellant regarding heroin transactions that were unrelated to the offenses for which appellant was on trial.

7. Whether the trial court erred in admitting into evidence crimes and statements that occurred prior to the offenses for which appellant was on trial.

8. Whether the lower court committed reversible error by permitting Detective Reyna to falsely testify that legal reasons precluded him from accurately depicting appellant's residence in an evidentiary model and in precluding defense counsel from cross-examining Reyna on this matter.

9. Whether the trial court erred in permitting Detective Reyna to reenact the shooting of the deceased.

10. Whether appellant was deprived of a fair trial by the five day separation between the end of the presentation of evidence and the beginning of closing arguments to the jury and the jurors' resulting loss of memory.

11. Whether prosecutorial misconduct during the state's closing argument denied appellant a fair trial.

12. Whether the trial court committed reversible error in refusing to give appellant's requested voluntary manslaughter instruction.

13. Whether the trial court erred in refusing to give appellant's requested involuntary manslaughter instruction.

14. Whether the lower court erred in refusing to allow defense counsel to be present at a presentence conference between the probation officer and the sentencing court.

15. Whether the trial court acted unlawfully in sentencing the appellant.

## INSTRUCTION REGARDING INTENT

Although not having done so at trial, appellant now objects to the following instruction that was given to the jury on the grounds that it impermissibly shifted to him the burden of proof on the issue of intent:

A person is presumed to intend to do that which he voluntarily and wilfully does in fact do, and is also presumed to intend the natural, probable and usual consequences of his use of a dangerous weapon likely to kill. If the use of such dangerous weapon does in fact cause great bodily harm or death it is presumed that such harm or death was intended by the assailant."

Other relevant instructions, given immediately after the above instruction, are the following:

"Any such presumption as I have mentioned, however, maybe [sic] overcome by contrary evidence, and any such evidence is sufficient to overcome it which creates in the minds of the jurors a reasonable doubt that the defendant's intent was so presumed, but in the absence of evidence to the contrary, the presumption must prevail.

"A defendant in a criminal case is presumed by law to be innocent. The law does not require a defendant to prove his innocence or to produce any evidence."

This sequence of instructions establishes the presumption that intent to kill or harm is determined from the use of a dangerous weapon, posits that it can be rebutted by contrary evidence, requires that it prevail in the absence of such evidence, and then states that the defendant need produce no evidence. Our concern is with the part that states that if the defendant fails to produce evidence which creates reasonable doubt, "the presumption must prevail." The net effect of the series of instructions is that it falls on appellant to disprove, rather than on the state to prove, the element of intent, an element required for both first- and second-degree murder.

We have previously indicated that "17 A.R.S., Rules of Criminal Procedure,

rule 21.3.c mandates waiver of error if a party does not object to the giving or failure to give an instruction * * *. Failure to object, however, does not waive instructional defects rising to the level of fundamental error. [citations omitted]" *State v. Dippre*, 121 Ariz. 596, 598, 592 P.2d 1252, 1254 (1979). Although appellant's counsel failed to object to the instructions at trial, we must nonetheless "address the issue because of potential fundamental error in the instruction." *Id.*

We have held that "in a criminal case, the trial judge is required to instruct the jury on his own motion upon the law relating to the facts of the case and upon matters vital to a proper consideration of the evidence." *State v. Pulliam*, 87 Ariz. 216, 222, 349 P.2d 781, 785 (1960). In that case it was held that failure to instruct the jury as to the manner in which a confession should be considered in their deliberations constituted fundamental error. *State v. Pulliam, supra*, was reversed on other grounds by *State v. Cobb*, 115 Ariz. 484, 566 P.2d 285 (1977) holding that thereafter the failure to give the *particular* instruction required by the *Pulliam* Court would no longer be fundamental error. For the reasons stated below, we believe that in the instant case the trial court erroneously instructed the jury in such a manner that the burden of persuasion on the issue of intent was improperly shifted to the defendant, and that this constituted fundamental error, which is defined as "such error as goes to the foundation of the case, or which takes from a defendant a right essential to his defense." *Pulliam, supra* at 222, 349 P.2d at 785. Therefore, appellant did not waive his rights by failing to object.

We concur in appellant's reliance on *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), which held an instruction which stated " '[t]he law presumes that a person intends the ordinary consequences of his voluntary acts,' " to be unconstitutional. *Id.* at 515, 99 S.Ct. at 2453, 61 L.Ed.2d at 45. The state maintains, however, that *Sandstrom*, having been decided after the case at bar, should not be given retroactive effect, but that if it is, the trial court's instructions do not violate the *Sandstrom* rule.

We find the state's retroactivity argument inapposite because *Sandstrom* represents merely a logical extension of principles established by the Supreme Court in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). The Court in *Winship* held that "[l]est there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375. In *Wilbur* the Court addressed and condemned a jury instruction that "affirmatively shifted the burden of proof to the defendant." 421 U.S. at 701, 95 S.Ct. at 1890, 44 L.Ed.2d at 520. The *Wilbur* Court stated further that "although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not, as the Court has long recognized, justify shifting the burden to him." *Id.* at 702, 95 S.Ct. at 1891, 44 L.Ed.2d at 521. It is just this burden that the instructions in the case at bar shifted to appellant, as explained in *Sandstrom*.

The *Sandstrom* Court applied the *Winship* and *Wilbur* reasoning to a case wherein the issue was

"whether, in a case in which intent is an element of the crime charged, the jury instruction, 'the law presumes that a person intends the ordinary consequences of his voluntary acts,' violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." *Sandstrom, supra*, 442 U.S. at 512, 99 S.Ct. at 2453, 61 L.Ed.2d at 43.

The Court found that this instruction could have been interpreted by the jury either as creating a conclusive presumption, incapable of rebuttal, or as shifting to the defendant the burden of persuasion on the element

of intent. The Court then condemned both possibilities and stated further that "[t]he potential for these interpretations of the presumption was not removed by the other instructions given at the trial." *Id.* at 518 n.7, 99 S.Ct. at 2456, 61 L.Ed.2d at 47. We believe the instructions in the instant case, as in *Sandstrom,* shifted to appellant the burden of persuasion on the element of intent by requiring appellant to introduce evidence that would overcome the presumption set forth in the instructions.

The state correctly points out that in *Sandstrom,* unlike in the instant case, the jury was not instructed that the presumption could be rebutted. The *Sandstrom* Court directly addressed this argument, however, in the following language:

"Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence—thus effectively shifting the burden of persuasion on the element of intent." *Id.* at 517, 99 S.Ct. at 2456, 61 L.Ed.2d at 47 (Emphasis in original.)

The only possible distinction is that the wording of the instruction in the case at bar indicates that the presumption could be overcome by evidence which would create a "reasonable doubt" in the jurors' minds that appellant's intent was presumed whereas *Sandstrom* alluded to proof greater than "some" evidence. However, as *Winship* and *Wilbur* make clear, it is not a defendant's responsibility to introduce reasonable doubt as to an element of a crime. Rather, it is the state's responsibility to prove the element beyond a reasonable doubt.

Having concluded that the giving of these instructions constitutes fundamental error, we must also determine whether that error is harmless beyond a reasonable doubt. *State v. Anderson,* 110 Ariz. 238, 517 P.2d 508 (1973). The state argues that the greater number of potentially ameliorating instructions in the case at bar distinguish this case from *Sandstrom.* We disagree because we feel it is the nature and effect of the instructions, not their number, which is determinative. The arguably ameliorative instructions in the case at bar were similar to those alluded to in *Sandstrom.* As the *Sandstrom* Court pointed out, however, the ameliorative instructions before it were "not rhetorically inconsistent with a conclusive or burden-shifting presumption. The jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied." *Id.* 442 U.S. at 519 n. 7, 99 S.Ct. at 2456, 61 L.Ed.2d at 47. We conclude, therefore, that because it is unclear from the record that the jury was not influenced beyond a reasonable doubt by the erroneous instructions, the error was not harmless. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. McVay,* 127 Ariz. 450, 622 P.2d 9 (1980). Accordingly, we must reverse on the murder count. *Cf.* Cameron & Osborn, When Harmless Error Isn't Harmless, 1971 Law.Soc.Ord. (Ariz.St.L.J.) 23 (1971).

In view of the possibility that a new trial on this count may be sought by the prosecution, we feel it necessary to resolve the following issues which may cause problems on retrial.

## DOUBLE JEOPARDY

Appellant urges that the prosecution's intentional failure to disclose exculpatory material from three witnesses prior to the first trial violates *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Appellant invites us to find, therefore, that the alleged *Brady* violations caused the second trial to be invalid as a violation of double jeopardy requiring that we reverse. We decline to so find.

The relevant material includes the first statement given to the police by Diane Greenwalt after the shooting, notes from an interview between the prosecutor and John

Hodgman on the day following the shooting and the fact of an interview between Charles Ferguson and the former prosecutor four months later. According to appellant, he first became apprised of this material shortly before and during the second trial. The significance of the material, according to appellant, lies in its bearing on the important question whether appellant knew that Headricks was a police officer. It is his contention that had the material been brought out in the first trial, it would have created for the jury a reasonable doubt on this critical issue which would have caused an acquittal thus sparing appellant the expense and anxiety of a second trial.

In *Brady* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. In *Agurs* the Court elaborated upon the situations in which *Brady* violations could occur and clarified the relevant standards of materiality indicating under what circumstances violations should be remedied. Our own Court has frequently made clear its commitment to the standards set forth in *Brady. See, e. g., State v. Jones,* 120 Ariz. 556, 587 P.2d 742 (1978); *State v. Salcido,* 109 Ariz. 380, 509 P.2d 1027 (1973); *State v. Maloney,* 105 Ariz. 348, 464 P.2d 793, *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970).

We need not determine, however, in the circumstances of this case whether the failure to disclose was of the type contemplated by the *Brady* and *Agurs* Courts for the following reasons. First, appellant cites no case, nor does our research disclose any, in which a *Brady* violation is held to constitute a double jeopardy violation or in which anything more than a new trial is mandated. *See, e. g., Cannon v. Alabama,* 558 F.2d 1211 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Norris v. Slayton,* 540 F.2d 1241 (4th Cir. 1976); *United States v. Gerard,* 491 F.2d 1300 (9th Cir. 1974); *Jones, supra.* Second,

even assuming a violation, appellant had a new trial and a more than adequate opportunity at that second trial to develop the alleged import of the previously undisclosed statements. Due process does not require more.

Although this issue did not surface until shortly before the second trial, appellant had full opportunity during that trial to exploit whatever advantage the undisclosed evidence gave him. He became aware of the Ferguson interview two full weeks before trial began and of the Greenwalt and Hodgman material on the third day of a trial which continued for more than a month. All three were examined at length. Having already received the benefit of a *Brady* violation remedy, we see no need to repeat a trial in which the material was already fully exploited.

## SEVERANCE

Appellant assigns as error the trial court's refusal to sever the narcotics charges from the homicide and assault charges. He argues first that refusal to sever forced him to testify on the narcotics charges in violation of the fifth and fourteenth amendments when he wished to testify only as to the homicide and assault charges. Second, he maintains that the refusal to sever was prejudicial to his defense of the narcotics counts because evidence of the homicide would be inadmissible in a separate trial of the narcotics charges.

■ Severance is governed by Rule 13.4, 17 A.R.S., Rules of Criminal Procedure, which provides, *inter alia,* as follows:

"c. Timeliness and Waiver. A defendant's motion to sever offenses or defendants must be made at least 20 days prior to trial or at the omnibus hearing and, if denied, renewed during trial at or before the close of the evidence. * * * Severance is waived if a proper motion is not timely made and renewed."

Appellant made his initial motion within the prescribed time limits. An examination of the record, however, fails to reveal any indication that the motion was renewed

"during trial at or before the close of the evidence." Rule 13.4(c), *supra*. We therefore hold that the motion was not timely renewed and that the issue is waived on appeal.

## ADMISSION OF EVIDENCE SEIZED AT APPELLANT'S APARTMENT

Appellant contends further that the trial court committed reversible error by admitting into evidence items seized, photographs taken and a film made by Detective Reyna and the homicide investigative unit at the apartment after their arrival. He also challenges admission of trajectories and a scale model of the apartment made subsequently.

Appellant argues first that because the trial court held Headricks' entry to be unlawful due to his failure to comply with the knock and announce statute, former A.R.S. § 13–1411, this unlawful entry tainted the subsequent seizure of all evidence. Further, although the Metro agents had a right to enter to render aid, they must not be allowed to benefit from the exigency created by Headricks' unlawful conduct and to seize evidence based on the plain view exception to the warrant requirement.

He urges as well that assuming the entry did not taint the evidence subsequently seized, the requirements of plain view were not met regarding that evidence with the possible exception of four guns found by the Metro agents during and after the gun battle. He argues that although the Metro agents could properly seize inadvertently discovered evidence during the emergency, this would not permit Detective Reyna to seize such evidence after the emergency had ceased or to expand his search to include evidence which the Metro agents could have seen but did not or which was not otherwise inadvertently discovered. The Metro agents would be able, however, to testify as to evidence which they in fact saw inadvertently. He concludes that once the emergency ended and the residence was secured, the police were no longer present for a reason unconnected with the search and that therefore a search warrant should have been obtained.

Prior to trial, appellant filed a motion to suppress and the state filed a motion in limine urging the admission of certain evidence. After argument on both motions, the trial court granted appellant's motion to suppress but nonetheless ruled admissible the items now challenged. In answer to a defense motion for additional findings, the trial court found, *inter alia*, "[t]hat because all the items * * * were in open view at the time the Metro agents were lawfully in the residence to render aid and secure the premises, the items are admissible," but that the Metro agents themselves saw only the weapons of all the admitted evidence.

Based primarily upon these findings, appellant characterizes the issue as whether the plain view doctrine applies to evidence that could have been, but was not, seen by the Metro agents and argues this to be an unwarranted extension of plain view theory. Such a characterization appears consistent to us with the trial court's findings, and our research has disclosed no cases which conceptualize plain view seizures in this manner. We have held, however, "that the trial court's rulings on a motion to suppress will not be disturbed on appeal absent clear and manifest error," *State v. Smith*, 123 Ariz. 231, 239, 599 P.2d 187, 195 (1979), and that the facts will be viewed in a manner most favorable to the trial court's ruling. *State v. Dugan*, 113 Ariz. 354, 555 P.2d 108 (1976).

Following the first trial of this matter, the United States Supreme Court stated that "[t]o what extent, if any, the evidence found in Mincey's apartment was permissibly seized under established Fourth Amendment standards will be for the Arizona courts to resolve on remand." *Mincey II, supra*, 437 U.S. at 395, n. 9, 98 S.Ct. at 2414, 57 L.Ed.2d at 302. We now resolve that question. The trial court's articulation of plain view to support admissibility is not necessary to our determination, however, for we hold that the plain view sightings of Detective Reyna himself justified admission of the challenged evidence. Therefore, we uphold the trial court's ruling of admissibility for we will affirm the trial court on

appeal if it has reached a correct result although it may have done so for an incorrect reason. *State v. Sardo*, 112 Ariz. 509, 543 P.2d 1138 (1975).

■ A fundamental precept in search and seizure cases is that "[t]he Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process * * * are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *Mincey II, supra*, 437 U.S. at 390, 98 S.Ct. at 2412, 57 L.Ed.2d at 298–99 (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967)). Warrantless entries and searches are nonetheless proper when the police "reasonably believe that a person within is in need of immediate aid." *Id.* 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300. Police are authorized to seize evidence in plain view during such legitimate emergency activities, *Mincey II, supra; Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), so long as their plain view is inadvertent and the incriminating nature of the evidence is immediately apparent to them. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977).

■ With these principles in mind we find first that appellant's initial argument, that Headrick's unlawful entry tainted the subsequent seizures, is without merit. Notwithstanding the trial court's instruction to the jury that Headricks' entry was illegal, the entry of the Metro agents to render assistance was lawful. Furthermore, there is no evidence on the record that the emergency was created to validate Headricks' illegal entry. Under these circumstances, the entry to render assistance sufficiently purged whatever taint may have been caused by Headricks' entry. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ We also decline to separate, as appellant would have us do, the entry of Detective Reyna and the homicide squad from that of the Metro agents and further decline to find that their presence and activities were not part of the emergency. As has been stated, the Metro agents were precluded from conducting their own investigation by police department policy. The evidence at the second trial showed also that Detective Reyna arrived and began his investigation only a short time after the shooting and while the Metro agents were still on the premises. Furthermore, Reyna relieved an extremely distressed Metro agent guarding Mincey and himself stood guard over Mincey for approximately ten minutes. Given what we perceive generally to be very sensible police policy, particularly in the emotion-charged circumstances of the shooting death of a fellow police officer, the relatively short space of time between the Metro agents' and Reyna's entries and Reyna's activities guarding appellant, we believe that Reyna's entry was merely a continuation of the initial emergency entry of the Metro agents. Reyna was, therefore, lawfully present during the emergency and could make plain view seizures during that time of evidence he observed in plain view. *See Tyler, supra; State v. Johnson*, 413 A.2d 931 (Me.1980); *State v. Anderson*, 42 Or.App. 29, 599 P.2d 1225 (1979), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980); *State v. Martin*, S.D., 274 N.W.2d 893, *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 112 (1979). His testimony at the suppression hearing demonstrates that he observed all the physical items admitted, the location of the bullet holes and the scenes depicted in the photographs and film between the time he entered the apartment and the time the wounded were removed.

■ However, Reyna did not take the photographs or seize the objected to items until after the apartment had been cleared and the emergency activities had ended. Although under traditional Fourth Amendment standards his presence without a warrant was no longer justifiable, *Coolidge, supra*, (probable cause does not justify search or seizure absent exigency), the law in Arizona at the time was believed to allow

the warrantless search of a murder scene. *Mincey I, supra.* It was not unreasonable, therefore, for Reyna, a professional homicide investigative officer, to continue processing the scene. *Cf. Johnson, supra; Anderson, supra; Martin, supra.*

We feel this to be especially true given how short was the time period involved. Within fifteen minutes to half an hour after the emergency had ended, Reyna directed one of the I.D. technicians to photograph everything before moving or tagging began. This set of photos was completed within half an hour at which time Reyna inquired of the county attorney whether he would need a warrant to continue. The county attorney informed him that he would not, unless he left the scene, and Reyna then had a second set of photographs taken after everything was tagged but before anything was moved. The film was also made during this time.

 Therefore, although both sets of photographs admitted at trial were taken and the film was made after the scene was secured, Reyna's continued presence was based on his understanding of Arizona law at the time, and the photographs and film represent merely a memorialization of his plain view sightings. *Cf. Carter v. Beto,* 426 F.2d 242 (5th Cir. 1970). Although the county attorney testified that he knew the Ninth Circuit had overruled the murder scene exception to the warrant requirement when he told Reyna a warrant was unnecessary, *Sample v. Eyman,* 469 F.2d 819 (9th Cir. 1972) (overruling a warrantless search of a murder scene), we cannot reasonably hold Reyna accountable for information he was not given. Reyna proceeded in good faith reliance on the law in Arizona as he was advised by a legal expert. *See United States v. Williams,* 622 F.2d 830 (5th Cir. 1980) (Part II).[2]

With the exception of the drugs and the drug paraphernalia, we feel that the scenes depicted in the photographs meet the remaining plain view tests. The discovery of the evidence shown in the photos we believe to have been inadvertent because the purpose of the buy-bust and of Headricks' initial entry was to investigate a drug transaction, not a homicide. We also believe that the incriminating nature of the evidence was immediately apparent. All the non-drug related items and scenes were patently associated with the homicide and included pictures of the guns, bullet fragments, bullet holes in the walls and the disarray in the bedroom where the struggle took place. The non-drug related photographs and film were therefore admissible.

The actual seizure of the physical evidence was not begun until approximately 7:00 p. m. All these items were within Reyna's legitimate plain view during the emergency and meet the further requirements of plain view seizure as discussed above with the exception of the drugs and paraphernalia. Thus these items were appropriately admitted.

 We do not believe, however, that the drugs and drug paraphernalia pass the test of inadvertence. It was the intent of the Metro agents to effect an arrest on drug charges and to seize evidence related to those charges when they went to the apartment. Because Headricks had informed the agents of the nature and location of the heroin in the bathroom before they positioned themselves in the hallway, it cannot successfully be argued that the discovery of the heroin in the bathroom was inadvertent. Although the Metro agents did not know of the presence and location of paraphernalia in the bedroom, we feel nonetheless that the discovery of these items fails equally to pass the inadvertence

---

2. We choose to confine applicability of the good faith rationale to the particular facts of this case. We do not believe that in these circumstances its use subverts the principal purpose of the exclusionary rule which is to discourage future official misconduct by proscribing the use at trial of unlawfully obtained evidence. *United States v. Calandra,* 414 U.S.

338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Reyna's activities followed defined police procedure, included the seeking of legal advice and cannot reasonably be perceived as an effort to trample upon appellant's rights. We are satisfied therefore, that the good-faith rationale as explained in *Williams,* Part II, is suitable for application in this case.

test because of the purpose of the entry. Therefore, these items and the pictures displaying them should not have been admitted at trial.

We do not find this error to be fatal, however. Appellant's own testimony made clear that he had heroin in the apartment at the time of the transaction in question, that he was addicted and that he would "fix" three to five times a day. The jury could easily infer therefrom that there would be drugs and drug paraphernalia in the apartment. The items and pictures were merely additional evidence and were not prejudicial to appellant, given the trial testimony.

■ Finally, the trajectories were plotted using the initial series of photographs which showed the bullet holes and from an examination of the apartment conducted when the state leased it in preparation for the second trial. The scale model was made primarily from measurements made anew and also during the second occupancy of the apartment. Both the trajectories and the scale model, therefore, were admissible. Thus the trial court did not abuse its discretion by admitting the challenged evidence.

## ADMISSION OF GREENWALT'S GRAND JURY TESTIMONY

Appellant assigns as further error the admission at trial of certain testimony of Carol Diane Greenwalt before the grand jury. In that testimony she stated that after Headricks left the apartment to get his money man, appellant began cleaning up the "paraphernalia" in the bathroom, by which she meant items associated with drug use. Appellant contends that because the victim's trial testimony demonstrated that in fact she could not see what appellant was doing in the bathroom, she was incompetent to testify regarding this matter because the testimony was not based upon personal knowledge. Appellant contends further that the statements were severely prejudicial as they went to the heart of his theory of self-defense by improperly bolstering the state's argument that appellant knew Headricks' identity.

The state responds that it used the grand jury testimony only to refresh the witness' memory as a recorded recollection and to impeach her testimony in the present trial that she could only remember appellant emptying ashtrays and not for its substantive content. It argues that the trial court has broad discretion in determining the relevance and admissibility of evidence and that the court correctly instructed the jury on credibility, testimonial inconsistencies and the use of prior statements. The state points out as well that both the prosecution and the defense brought out testimony indicating that Greenwalt was unable to see into the bathroom and had not looked in the trash bag in question. Hence there was neither error nor prejudice.

■ Although it is true that the trial court has a certain amount of discretion in determining admissibility, *State v. Flynn*, 109 Ariz. 545, 514 P.2d 466 (1973), and that the trial judge's discretion in admitting evidence will not be disturbed on appeal absent clear abuse, *State v. Sturgis*, 113 Ariz. 311, 553 P.2d 665 (1976), it is equally true that evidence not based on personal knowledge is inadmissible and should be stricken upon proper objections. *See, e. g., United States v. Lyon*, 567 F.2d 777 (8th Cir. 1977), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978); *City Nat. Bank v. Nelson*, 218 Ala. 90, 117 So. 681 (1928); *Jamestown Plumbing & Heat Co. v. City of Jamestown*, 164 N.W.2d 355 (N.D.1968). *See generally*, McCormick on Evidence, § 10; 2 J. Wigmore, Evidence § 478 (Chadbourn rev. 1979). Greenwalt's testimony was not objected to during the grand jury proceedings because appellant was unable to cross-examine. Appellant did object during trial, however, and was overruled. The development of testimony following the objection demonstrates that, in fact, Greenwalt did not see what appellant was doing in the bathroom or what was in the trash bag.

■ The Arizona courts have not directly addressed the question whether incompetent grand jury testimony can be admitted at trial. Rule 602 of the Arizona Rules of Evidence, 17A A.R.S., provides, however,

**404**

that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Our rule is identical to the federal rule which has been interpreted to preclude "testimony concerning matters the witness did not observe or had no opportunity to observe." *Lyon, supra,* at 784. Although grand jury testimony may be used to impeach a witness' trial testimony, *e. g., Gollaher v. United States,* 419 F.2d 520 (9th Cir.) *cert. denied,* 396 U.S. 960, 90 S.Ct. 434, 24 L.Ed.2d 424 (1969); *State v. Frommelt,* 159 N.W.2d 532 (Iowa 1968), we agree with appellant that the witness must have been competent to give that testimony for it to be admissible at a subsequent trial.

■ We also agree that the prosecution intended that the testimony be used for its substantive content and not just to refresh the witness' recollection or to impeach her trial testimony. During closing argument, the prosecutor urged the jury to:

> "[u]se the prior testimony if it is going to be of assistance to you, especially the grand jury testimony of Diane Greenwalt, because today she doesn't really remember according to her. That testimony is useful. That is competent evidence * * *."

We hold, therefore, that the grand jury testimony should have been excluded upon appellant's objection.

The testimony was relevant both to appellant's knowledge that Headricks was a police officer, and thus to the murder charge, and to the drug charges. We cannot conclude beyond a reasonable doubt that the admission of this testimony was harmless as to the murder count and that without it, the jury would have found appellant guilty. *State v. McVay,* 127 Ariz. 450, 622 P.2d 9 (1980). The use of this testimony compounds our inability, explained in our treatment of the intent instruction, to determine upon what factors the jury verdict on the murder count was based.

■ With regard to the drug charges, however, we have no such difficulty and

conclude that the admission of the testimony constituted harmless error. Appellant's own testimony implicated him in drug dealing and drug use on the day of the shooting. The admission of this testimony could, therefore, no further prejudice appellant on the drug charges than his own testimony did.

## CROSS–EXAMINATION REGARDING PRIOR SALES OF HEROIN

Appellant contends that during argument on his motion in limine to preclude evidence of his prior drug dealing, the prosecution agreed not to introduce any such evidence in its case in chief and that the trial court considered the issue resolved. At trial during cross-examination the prosecution, over objection, elicited testimony from appellant about his drug sales during the month preceding the shooting. Earlier, during redirect examination of one of the state's witnesses, Antonio Acosta, the prosecution had asked whether Acosta knew that appellant had been dealing during the month of August, two months prior to the shooting. Acosta replied that he did not know that for a fact. Appellant argues that the admission of both declarations of prior bad acts was so prejudicial as to require reversal. We do not agree.

■ Rule 404(b) of the Arizona Rules of Evidence generally excludes evidence of prior bad acts "to prove the character of a person in order to show that he acted in conformity therewith" because of the danger that a defendant will be convicted for his criminal propensity rather than for his guilt of the crime charged. *See State v. Rose,* 121 Ariz. 131, 589 P.2d 5 (1978); *State v. Petralia,* 110 Ariz. 530, 521 P.2d 617 (1974); *accord, Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The rule allows admission, however, to show intent, motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident. *See State v. Price,* 123 Ariz. 166, 598 P.2d 985 (1979). We believe the evidence of appellant's drug dealing was helpful to a determination of

motive, intent, knowledge or absence of mistake or accident by establishing the background in which were set the events culminating in the shooting. We also believe the evidence was admissible to complete the story of the crime. *See Price, supra; State v. Villavicencio,* 95 Ariz. 199, 388 P.2d 245 (1964).

Furthermore, "Arizona follows the English or 'wide open' rule, wherein cross-examination may extend to all matters covered by direct examination, and to any other matter within the knowledge of the witness having relevancy to the issues at the trial." *State v. Gilreath,* 107 Ariz. 318, 320, 487 P.2d 385, 387 (1971), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1781, 32 L.Ed.2d 121 (1972). *See also, State v. Evans,* 120 Ariz. 158, 584 P.2d 1149 (1978); *State v. Jones,* 109 Ariz. 378, 509 P.2d 1025 (1973).

Appellant's testimony on cross-examination related to his decision to sell heroin rather than to steal to support his habit, and to his dealing during the month of October. The trial court overruled his objection holding that appellant had opened the door on the issue. We agree with the state that appellant opened the door to this line of questioning during his opening statement in which his counsel told the jury that appellant was an addict, that evidence would be presented regarding heroin addiction, and that selling drugs is among the ways an addict can support his habit. Appellant argues, however, that opening statements do not constitute evidence. *See People v. Arnold,* 199 Cal. 471, 250 P. 168 (1926).

This Court has held nonetheless that "[t]he object of an opening statement is to apprise the jury of what the party expects to prove and prepare the jurors' minds for the evidence which is to be heard." *State v. Prewitt,* 104 Ariz. 326, 333, 452 P.2d 500, 507 (1969). Furthermore, the Court of Appeals has stated that "[t]he jury has the right to consider counsel's opening statement." *State v. Adams,* 1 Ariz.App. 153, 155, 400 P.2d 360, 362 (1965).

Appellant argues as well that the opening statement indicates that nothing more than

the life of a drug dealer would be described. It is equally arguable, however, that both the jury and the prosecution could have understood that such references would relate in particular to appellant's life. This conclusion is strengthened by appellant's testimony on direct that he had been a drug addict for some time and that he had moved in with a woman who was an addict and a dealer. In light of our holding in *Gilreath, supra,* concerning the scope of cross-examination, the prosecution's questions were not inappropriate.

With regard to the testimony of witness Acosta during the state's case in chief, we do not feel there was any error in its admission. Appellant raised no objection at the time and thus waived his right to do so on appeal so long as there is no fundamental error. *State v. Wilson,* 113 Ariz. 308, 553 P.2d 235 (1976); *State v. Miller,* 112 Ariz. 95, 537 P.2d 965 (1975). We find no such error and no prejudice in the witness' answer as he testified that he had no knowledge that appellant was dealing.

The trial court, therefore, did not abuse its discretion in admitting the evidence challenged here by appellant.

## ADMISSION OF PRIOR STATEMENTS AND CRIMES

Two groups of statements made by appellant prior to the incident in question were admitted because the trial court found them to be relevant to the issue of premeditation. The first group relates to a request by appellant that Antonio Acosta saw off a shotgun for him because "he wanted it for protection in case he got hassled by the pigs." Also in relation to the shotgun, George Klauss testified that appellant stated that he wanted the gun sawed off to "kill a pig if they get in my way, or something like that." These statements were made during the August preceding the events in question.

The second group relates to an automatic pistol that appellant wanted adjusted to fire faster. Duain First testified that a few

weeks before October 28 appellant asked whether First could make such an alteration. On the Friday before the day of the shooting appellant returned to First's shop with an automatic weapon which First said he would not touch. According to First, appellant then said "he wasn't going to kill anybody, he just wanted to scare them in case they hassled him."

The trial court admitted the First testimony on the issue of premeditation. Appellant's principal challenge is that his statement to First demonstrated a changed intent and a lack of premeditation because it referred to scaring, not killing, people and because it did not constitute a threat to a specific class, contrary to the earlier statement to Acosta. He concludes from this that the testimony of one of the three witnesses should have been admitted. He also argues that the prejudice generated by the admission of these prior bad acts, as tending to relate to his character, outweighed their relevance to the issues of intent and premeditation. We will not, however, overturn a decision of the trial court on the relevance and admissibility of evidence absent an abuse of discretion. *State. v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978); *State v. Sturgis*, 113 Ariz. 311, 553 P.2d 665 (1976). We find no abuse.

As we stated in our earlier discussion of the issue relating to testimony concerning prior sales of heroin, our evidentiary rules do not allow admission of prior bad acts to show the defendant's character and his actions in conformity therewith. Arizona Rules of Evidence, Rule 404(b). They are admissible, however, to show intent. *See State v. Price*, 123 Ariz. 166, 598 P.2d 985 (1979). We have held as well that "[i]n resolving the issue of premeditation and deliberation the jury is authorized to take into consideration the conduct of the defendant, both before and after, as well as at the time of the homicide, and all attending circumstances." *State v. Coey*, 82 Ariz. 133, 142, 309 P.2d 260, 266 (1957); *accord, Duonnolo v. State*, 397 A.2d 126 (Del.1978); *State v. Tikka*, 8 Wash.App. 736, 509 P.2d 101 (1973).

With these principles in mind, we believe the trial court acted well within its discretion in admitting the testimony of all three witnesses regarding appellant's statements. The testimony of Acosta and Klauss bore directly on the issues of intent and premeditation for it related to statements by appellant describing what he would do in the event he was confronted by police. The statement to First, although seemingly of a less menacing nature, nonetheless indicated what appellant's response would be to being hassled by anybody, police or otherwise. The statement, in combination with his wish to have a rapidly-firing automatic weapon, could also be interpreted therefore, as relevant to intent and premeditation.

As we indicated in our previous treatment of this case:

"Similarly, so long as it is a reasonable inference, it is within the jury's province to decide if the shooting incident is a manifestation of the earlier statement[s]. In this case one reasonable inference from the evidence is that the shooting was a manifestation of appellant's earlier statement[s]. The fact that belief in appellant's defense theory would lead one to the opposite inference does not create reversible error, or, indeed, any error at all." 115 Ariz. at 481, 566 P.2d at 282.

*See also Coey, supra.*

For these reasons we do not believe the trial court abused its discretion in admitting the testimony of the three witnesses.

## MODEL OF THE APARTMENT

Appellant contends further that his constitutional rights were violated when the trial court allowed Detective Reyna to testify that "legal reasons" prevented him from accurately depicting the apartment in the scale model but precluded appellant from "cross-examining" Reyna as to the basis and validity of the "legal reasons." Specifically he argues that his Sixth Amendment right to confront the witnesses against him through cross-examination was thus violated as well as his Fourteenth Amendment due process right to a fair trial by the

prosecution's knowing use of false testimony. We do not accept these contentions.

The model did not depict a telephone cord that stretched from a chair on the bed across to a desk in appellant's bedroom obstructing the pathway between the bed and the desk. The presence of the telephone cord was considered important by appellant to his explanation of the sequence of events that transpired in the bedroom and differed from the prosecution's view. The distinction was highlighted during cross-examination of Reyna when appellant's counsel, using photographs taken by Reyna shortly after his arrival at the apartment which depicted the items missing from the model, elicited Reyna's agreement that the cord would be an obstruction which would have to be stepped over.

On redirect the prosecutor elicited the following testimony from Reyna:

"Q. On that particular point, for certain legal reasons, was Mr. Condron and yourself asked to reconstruct the apartment mock-up which is state's 10 or 11, whatever the mock-up is, using—10, using solely what is available in 1978 and '79?

"A. Yes, sir.

"Q. The exhibits, the photographs that are being shown to the jury, were those shown to the jury the very first day that you were on the stand?

"A. Yes, sir, I believe so, the first group of photos that I had taken immediately after I got there as soon as I could start photographing.

"Q. So those are photographs taken at your direction the night or the afternoon hours of the 28th of October, 1974, and that is the condition of the room back then?

"A. Yes, sir.

"Q. Were you present when Mr. Condron was instructed not even to look at photographs from 1974 and '75 as he made this mock-up?

"A. Yes, I was.

"Q. For certain legal reasons?

"A. Yes, sir."

At this point began the sequence of questions to which appellant now objects:

"MR. OSERAN: May I ask one question on voir dire?

"THE COURT: Yes.

"MR. OSERAN: Do you know of any legal reason why that chair could not have been placed on the bed in this—

"THE COURT: I don't want you asking witnesses legal questions.

"MR. OSERAN: Well, okay."

Appellant appears to equate voir dire questions with cross-examination. However, he cites to us no cases which stand for this proposition; nor has our research disclosed any.

■ Black's Law Dictionary defines voir dire as follows: "To speak the truth. This phrase denotes the preliminary examination which the court may make of one presented as a witness or juror, where his competency, interest, etc., is objected to." Black's Law Dictionary 1746 (rev. 4th ed. 1968). In the instant case, it appears to us that appellant's counsel was seeking to establish some foundation, or the lack of it, for Detective Reyna's assertion that "legal reasons" prevented him from including the excluded items in the model. In the absence of any support in the cases, we decline to equate a foundation-seeking question on voir dire with cross-examination. We therefore find that appellant's confrontation rights were not denied.

We also believe that any prejudice that may have inured from Reyna's alleged false testimony that such legal reasons existed was cured. The jury was thoroughly familiar with the photographs that vividly displayed the items excluded from the model. Furthermore, on objection by appellant's counsel shortly after the above-quoted testimony, the trial court instructed the prosecution to cease referring to "legal reasons." For these reasons we find there was no error.

### REENACTMENT

Appellant argues that the trial court committed reversible error in allowing a

demonstration of firing positions by Detective Reyna involving a reenactment of the shooting of Officer Headricks. He reasons first that Detective Reyna lacked the personal knowledge necessary to render an expert opinion because he did not witness the actual shooting, and that the jurors could have formed their own opinion based on evidence admitted previously. His second argument is that there was no substantial similarity between the conditions of the demonstration and those existing at the time of the shooting. We do not agree.

The demonstration in question was introduced to rebut appellant's contention that he never aimed at the decedent and was considered by the trial court, on the state's offer of proof, as relevant to premeditation and self-defense. It consisted of Officer Reyna's assuming and describing various positions consistent with plotted trajectories shown in the mock-up of the apartment.

Rule 702 of the Arizona Rules of Evidence, 17A A.R.S., relating to expert testimony provides that:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The determination of whether the expert's opinion will be helpful to the jury is left to the discretion of the trial judge, *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978), and we will overturn the exercise of that discretion only upon a showing of abuse. *State v. Kevil*, 111 Ariz. 240, 527 P.2d 285 (1974); *accord, United States v. Brown*, 557 F.2d 541 (6th Cir. 1977); *Faircloth v. Lamb-Grays Harbor Co., Inc.*, 467 F.2d 685 (5th Cir. 1972).

Appellant's argument that Reyna lacked personal knowledge of the shooting and that thus his expert opinion was inadmissible is misplaced. The knowledge upon which his testimony was based related not to the shooting itself but to the positions a person would have to assume to conform to the plotted trajectories. The detective demonstrated various positions for a number of the trajectories in an attempt to show whether positions in conformity with appellant's testimony were feasible.

We believe that this testimony would assist the jury in this instance, *Mosley, supra; accord, Commonwealth v. Phillips*, 273 Pa. Super. 321, 417 A.2d 669 (1979), and agree with the trial court that the demonstration was relevant to the issues of premeditation and self-defense. *See* Arizona Rules of Evidence, Rule 402, 17A A.R.S.

We are also unpersuaded by appellant's further contention that the alleged lack of substantial similarity of conditions rendered the demonstration inadmissible. He argues that the demonstration assumed that he fired from stationary positions, contrary to his view of the evidence, and that the courtroom bore no similarity to his residence. While acknowledging the veracity of these arguments, we nonetheless find them not to be controlling of the issue.

We have held that the conditions of a demonstration must be similar to those being duplicated in order for the demonstration to be admissible. *E. g., State v. Burkheart*, 106 Ariz. 490, 478 P.2d 515 (1970); *Ong v. Pacific Finance Corp.*, 70 Ariz. 426, 222 P.2d 801 (1950). Udall has pointed out, however, that "[t]he requirement of similarity is a relative one and should not be over-rigidly applied where the experiment is of substantial enlightening value to the jury." M. Udall, Arizona Law of Evidence, § 136 n.28 (1960); *accord, Ivey v. State*, 369 So.2d 1276 (Ala.Cr.App.1979); *State v. Mayhand*, 298 N.C. 418, 259 S.E.2d 231 (1979). This is a determination which, absent abuse, is left to the discretion of the trial court. *Burkheart, supra.* We find no such abuse in the instant case based on the trial court's finding of relevance.

## FIVE DAY DELAY

Appellant contends additionally that the five-day delay between the end of the presentation of evidence and the begin-

ning of the jury's deliberations denied him a fair trial because of the jurors' loss of memory as demonstrated by their request to see certain portions of the trial transcript. We do not agree.

The sequence of events causing the delay began on Wednesday, February 14, 1979, when the last witness' testimony ended. The trial judge wished to settle instructions that afternoon and the following morning. First, however, it was determined necessary to resolve appellant's motion requesting that the felony murder question not be submitted to the jury. That issue was resolved on that afternoon after the jury had been requested to return the morning of the 15th for closing arguments. Discussion of jury instructions then began and continued the next day, Thursday, the 15th. Appellant's counsel had previously requested that closing arguments take place on Friday, the 16th.

Thursday afternoon, before jury instructions were settled, the state filed a special action in Division II of the Court of Appeals challenging the trial court's ruling on the felony murder issue. That Court was unable to schedule its hearing until 4:00 p. m. so work on the jury instructions continued. The Court of Appeals resolved that this Court should hear the special action at which point the parties resolved to contact us by telephone. That same afternoon we ordered the trial court to stay its proceedings until we resolved the state's question the following morning, Friday, the 16th.

The trial judge then asked appellant's counsel if he wished to have the jury reconvened on Saturday, the 17th, for closing argument. Appellant's counsel felt that to do so would prejudice the jury because the following Monday was a holiday and the jury would therefore resent being brought back to court in the middle of a three-day weekend. The jury was finally reconvened on the following Tuesday, February 20, for closing arguments. When the jury retired to deliberate and requested the transcript, appellant's counsel successfully objected on grounds of substantial risk of inadvertent failure to discover portions of the transcript.

We do not believe that these circumstances prejudiced appellant. We have held that a delay of *ten* days is not prejudicial where requested testimony is read to the jury after it has begun deliberating. *State v. Johnson*, 122 Ariz. 260, 594 P.2d 514 (1979). In the instant case, although the jury was unable to have testimony read to it, the delay was much shorter than in *Johnson.* The jury also heard closing arguments just prior to beginning its deliberations during which appellant's counsel adequately reminded the jury of his theory and the evidence supporting it. In light of these factors, and considering that the trial court made every effort to avoid unnecessary delay, we find no error.

## PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Appellant objects to three categories of statements made by the prosecutor during closing argument: first, a statement to the effect that John Hodgman testified to telling the judge at his own sentencing hearing for obstruction of justice that he knew the intruders were police; second, allegations that the defense was based on deceit and testimony perjured to fit within the theory of self defense; last, an alleged misstatement of law that self defense does not apply to an individual engaged in a heroin transaction. Appellant argues that each of these standing alone violated his right to a fair trial. We do not agree.

With regard to the first statement, appellant objected to its introduction arguing that Hodgman had not testified as claimed by the prosecution. His assertion was correct, and the trial judge therefore upheld his objection instructing the jury in the following language:

"Again, ladies and gentlemen, if either counsel makes a statement about the evidence different from what you remember, disregard it. What the attorneys say is not evidence and you should remember to follow your own memories."

■ We have previously held that counsel are given broad latitude in their closing

arguments but that their comments must be based on the evidence. *State v. Price*, 111 Ariz. 197, 526 P.2d 736 (1974); *State v. Neil*, 102 Ariz. 299, 428 P.2d 676 (1967). In the instant case, the prosecutor's comment was not based on the evidence and was, therefore, improper. We must also determine, however, whether appellant was prejudiced thereby because, as we have said before, "[i]t does not necessarily follow from the fact of improper argument that the jury was improperly influenced." *State v. King*, 110 Ariz. 36, 42, 514 P.2d 1032, 1039 (1973).

The test for determining prejudice requires us to find, first, that the comment presents matters the jurors should not consider and, second, that the jury was influenced thereby. *State v. Smith*, 114 Ariz. 415, 561 P.2d 739 (1977); *State v. Freeman*, 114 Ariz. 32, 559 P.2d 152 (1976). We have already determined that the comment would fail the first part of the test. However, appropriate instructions can offset or cure any influence on the jury. *State v. Landrum*, 112 Ariz. 555, 544 P.2d 664 (1976); *King, supra*. We believe the trial judge's instructions in the instant case cured any potential prejudice.

Appellant's second objection is to comments implying that his defense was based on perjury to conform to his theory of self defense. The comments appear to be of three general sorts: those which contain the prosecutor's view of the facts and a statement that appellant would have to negate them for his theory to work; those challenging the credibility of defense witnesses; and those indicating to the jury where it had been deceived.

We made no objection at trial to these comments. We have held that where there is no objection at trial, it is waived on appeal, *State v. Johnson*, 122 Ariz. 260, 594 P.2d 514 (1979); *State v. Williams*, 113 Ariz. 442, 556 P.2d 317 (1976), unless the comments constitute fundamental error, *State v. Marvin*, 124 Ariz. 555, 606 P.2d 406 (1980). We do not find the comments to be prejudicial, however, and therefore find no fundamental error.

We have stated that "[c]ounsel may comment on the credibility of a witness where his remarks are based on the facts in evidence," *Williams, supra*, at 444, 556 P.2d at 319, and that counsel can argue all reasonable inferences from the evidence. *Freeman, supra; Price, supra*. We see the objected-to comments as falling within one or the other of these two rubrics.

Appellant's final challenge to an alleged misstatement of law by the prosecution is equally without merit. The language to which he objects is the following:

"A person has a right to defend himself. He has a right to get into his own home and so on and so forth. You have a right to do this. And he tells you you have a right to do this. Yes, absolutely you do, but you are not in the middle of a narcotics transaction.

"His testimony is, I have been dealing out of that place at night. My girlfriend is doing it in the day. I'm doing it at night for months and it is always in your mind that it is a possibility of a cop. That is not the average citizen. That's not the person that law was designed to protect."

Appellant posits the meaning intended by these statements to be that because he was engaged in a heroin transaction, he is not the kind of person who can avail himself of the theory of self-defense.

We disagree with appellant's interpretation. We view the meaning of the above-quoted passage, when read in the context of the entire argument, to be that a person engaged in dealing in heroin is more likely than other people to determine that someone in plain clothes may be a policeman. Such an inference is not unreasonable from the evidence presented at trial and is, therefore, neither inappropriate nor prejudicial.

### VOLUNTARY MANSLAUGHTER INSTRUCTION

Appellant advances as prejudicial error the trial judge's failure to instruct the jury that absent express malice when an officer is killed by one who is attempting to resist

an unlawful arrest, the killing cannot be any greater offense than voluntary manslaughter. Appellant's argument consists essentially of the common law right to resist unlawful arrest, which reduced murder to manslaughter, and is based primarily upon *Bad Elk v. United States*, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900). We find no error.

We have previously held that "[a] defendant is entitled to have the jury instructed on any theory of his case reasonably supported by the evidence." *State v. Melendez*, 121 Ariz. 1, 5, 588 P.2d 294, 298 (1978); *accord State v. Miller*, 108 Ariz. 441, 501 P.2d 383 (1972). The trial court, recognizing that the evidence reasonably supported a theory of voluntary manslaughter, gave an instruction identical to another requested by appellant and to R.A.J.I. (Crimes) No. 5.

We reject appellant's proposition that the statement in *Bad Elk* of the common law right to resist arrest should control the form of instruction in the instant case. In *Bad Elk*, the Supreme Court explained that

"At common law, if a party resisted arrest by an officer without a warrant, and who had no right to arrest him, and if in the course of that resistance the officer was killed, the offence of the party resisting arrest would be reduced from what would have been murder, if the officer had had the right to arrest, to manslaughter." *Bad Elk, supra*, 177 U.S. at 534, 20 S.Ct. at 731, 44 L.Ed. at 876.

In Arizona, however, the law for many years had been that "a person illegally arrested may resist the arrest, using such force as may be reasonably necessary, *short of killing the arresting officer*." *Dugan v. State*, 54 Ariz. 247, 250, 94 P.2d 873, 874 (1939) (Emphasis supplied). During the 1970's our courts began to question whether there even remained a right to resist an unlawful arrest. *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040 (1977); *State v. Lockner*, 20 Ariz.App. 367, 513 P.2d 374 (1973).

Appellant was, therefore, not entitled under Arizona law to an instruction of the sort he requested. The trial court's instruc-

tion on voluntary manslaughter accurately stated the law and in no way prejudiced appellant.

## INVOLUNTARY MANSLAUGHTER INSTRUCTION

Appellant also claims prejudicial error from the trial judge's refusal to give the following requested involuntary manslaughter instruction:

"You, as jurors, are instructed that involuntary manslaughter is committed when one engaged in lawful conduct causes death in an unlawful manner. *You are further advised that an individual has the right to resist an unlawful arrest with reasonable force, and that deadly force can only be used if an individual is in reasonable fear of death or serious bodily injury.* Therefore, if you find that at the time of the shooting the Defendant was resisting an unlawful arrest but caused death by his unreasonable use of deadly force, you may find the Defendant guilty of involuntary manslaughter." (Emphasis supplied).

We believe the trial judge's refusal was justified.

As we indicated in our discussion of the voluntary manslaughter instruction, Arizona does not recognize the right to use deadly force to resist an unlawful arrest. The underlined language in appellant's requested instruction incorporates, therefore, an incorrect statement of law and was correctly refused. The trial court adequately and properly instructed on voluntary manslaughter.

## PRE–SENTENCE CONFERENCE

Appellant initially challenges the sentence on the grounds that a closed meeting between the sentencing judge and the probation officer to discuss the officer's presentence report before sentence was imposed was a violation of due process. He argues that false and unverified material was included in the addendum to the report and that therefore refusal to allow defense counsel to be present deprived appellant of

a means of insuring that only reliable evidence be considered by the sentencing court. We do not agree.

Sentencing procedure is governed by Rule 26, 17 A.R.S. Rules of Criminal Procedure. It is true, as appellant indicates, that the rule does not provide for a meeting of the sort challenged herein. We do not, however, consider that this meeting detracted in any way from the purposes of the Rule or from appellant's rights.

Our Rule 26.4 provides that in those cases where the judge has discretion as to the sentence to be imposed, a pre-sentence report must be prepared, unless one already exists, and must be made available to the judge at least two days before sentencing. Rule 26.6 requires the sentencing judge to disclose pre-sentence reports to both prosecution and defense at least two days before sentencing subject to the provision for exclusion of specified sensitive material. Rule 26.7 provides that at the request of a party, the court should hold a pre-sentencing hearing but that the hearing shall not be held until the parties have examined the pre-sentence report. The purpose of the hearing includes allowing a party "to correct or amplify the pre-sentence * * * reports." 17 A.R.S. Rules of Criminal Procedure, Rule 26.7(b). The rules further provide that a conference may be held before the hearing "to ascertain and limit the matters in dispute or otherwise expedite the pre-sentencing hearing," *id.*, Rule 26.7(c), and that the probation officer who prepared the pre-sentence report may be compelled to attend.

The conference here in question occurred on the day scheduled for sentencing. Prior thereto appellant had submitted to the judge a letter and memorandum regarding alleged misrepresentations and omissions in the pre-sentence report addendum. The memorandum contained material rebutting the allegations in the report. For reasons which do not appear from the record, appellant did not request a pre-sentencing hearing seeking to correct the report. He chose instead to submit the above-mentioned memorandum which the judge took into consideration in her deliberations. Nor did

he object when the time came for sentencing. Subsequent to sentencing, however, he moved to modify the sentence based on his objections to the pre-sentence report and meeting. During the hearing on the motion, the judge made clear that she had disregarded the items appellant had challenged. She had also indicated just prior to her meeting with the probation officer before sentencing that she would make every effort to leave out of consideration items in the report that were improper.

The Court of Appeals has directly addressed appellant's due process contention and has held that "[t]here is no due process requirement that every conversation between the probation officer and the sentencing judge be open to the defendant." *State v. Martinez*, 121 Ariz. 62, 64, 588 P.2d 355, 359 (App.1978). Furthermore, the recommendations of the probation officer regarding disposition or sentence do not need to be disclosed. *State v. Pierce*, 108 Ariz. 174, 494 P.2d 696 (1972).

Appellant has cited no authority which directly supports his position but has instead relied on cases which are either inapposite or are more supportive of the judge's procedure. The major distinction to be drawn from a case cited by appellant that most closely approximates the one at bar, *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971), is that in the case at bar, the trial judge did not use the allegedly faulty material in imposing sentence.

■ Appellant received all the pre-sentence material submitted by the probation department and had full and fair opportunity to challenge allegedly improper portions both before and after sentencing. In light of these opportunities and of the judge's assurances regarding what she considered in imposing sentence, we see no reason to depart, in this instance, from the holding of the Court of Appeals in *Martinez, supra.*

## UNLAWFUL SENTENCING

Appellant's second attack on the sentencing consists of his argument that it is invalid because of an appearance of vindictive-

ness and an insufficient evidentiary foundation. As to the appearance of vindictiveness, it is appellant's contention that the judge imposed a harsher sentence on retrial without specifying her reasons on the record in violation of the due process requirements set out in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The harsher sentence, according to appellant, arises from the imposition in the second trial of the same penalty for the murder conviction as in the first trial, although the conviction in the first trial was for murder, first degree and in the subsequent trial for second degree murder.

The *Pearce* Court reiterated the principle that the government may retry a defendant whose conviction is set aside because of legal error without violating double jeopardy principles and stated further that "a corollary of [that] power * * * is the power, upon the defendant's reconviction, to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction." *Id.* at 720, 89 S.Ct. at 2078, 23 L.Ed.2d at 666. The Court explained that the trial judge has the power to impose a more severe sentence "in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' *Williams v. New York,* 337 U.S. 241, 245, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337, 1341." *Id.* 395 U.S. at 723, 89 S.Ct. at 2079, 23 L.Ed.2d at 668. The Court continued that "[s]uch information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources." *Id.*

For due process purposes, however, the Court limited the ability of a trial court to impose a more severe penalty so as to prevent a trial court's penalizing a defendant for exercising his right to attack a conviction. The Court stated that "[d]ue process of law * * * requires the vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new

trial." *Id.* at 725, 89 S.Ct. at 2080, 23 L.Ed.2d at 669. In order to guarantee that there be no such vindictiveness, the Court mandated that where a sentencing judge imposes a more severe penalty on retrial, his reasons must be stated on the record and must be "based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* at 726, 89 S.Ct. at 2081, 23 L.Ed.2d at 670. Although Arizona follows the requirements of *Pearce, see State v. Cruz,* 123 Ariz. 497, 600 P.2d 1129 (App.1979), we do not agree that in this instance the sentence imposed after the second trial was more severe than that imposed after the first.

■ In each case, the penalty was imprisonment for a minimum of twenty-five years and a maximum of life. *Pearce* makes clear that on a defendant's reconviction, the sentencing court may "impose whatever sentence may be legally authorized." 395 U.S. at 720, 89 S.Ct. at 2078, 23 L.Ed.2d at 666. The authority for such a sentence for second degree murder is found in former A.R.S. §§ 13–453(B) and 13–1644. Dispositive of our determination, however, is Rule 26.14, 17 A.R.S. Rules of Criminal Procedure, which embodies the *Pearce* standards for sentencing upon retrial or resentencing. *See Cruz, supra:* Rule 26.14, *supra;* State Bar Comm. Note. The pertinent language is as follows: "[T]he court may not impose a sentence for the same offense, or a different offense based on the same conduct, which is more severe than the prior sentence * * *." Rule 26.14, *supra.*

Appellant contends that "[j]ust as *Pearce* holds that, absent specific findings in the record, due process is denied when a defendant is given a harsher sentence for the same offense following retrial, so must it also be denied when he receives the same sentence for a lesser crime following his successful appeal." We believe the language in the above-quoted rule contradicts appellant's position. Appellant was convicted of a different offense in the second trial, second degree murder, but the convic-

tion was based on the same conduct, the shooting of Officer Headricks. The sentence in each case for that portion of the indictment was identical. The trial judge did not impose a sentence more severe than the prior sentence and, therefore, complied with Rule 26.14. We find no violation of the *Pearce* requirements.

Appellant argues further that sentence was imposed without a sufficient evidentiary foundation. His contention is that because the judge disregarded the addendum to the pre-sentence report which covered appellant's conduct since imposition of sentence after the first trial, she abused her discretion by not continuing the sentencing to obtain a more accurate report. He also maintains that the original report contained statements held to be unreliable by the Supreme Court because of their involuntary nature, tainting reliance upon that report. We do not accept appellant's arguments.

Appellant calls our attention to Rule 26.-4(a), 17 A.R.S. Rules of Criminal Procedure which mandates the preparation of a pre-sentence report except that discretion may be exercised where one already exists. In *State v. Blier*, 113 Ariz. 501, 557 P.2d 1058 (1976), we held that a sentencing court did not abuse its discretion by not requiring a pre-sentence report when there was one before it that was less than a year old. Appellant argues that allowing an interval of four years to pass without an accurate update does constitute an abuse of discretion.

■ Although a pre-sentence report is mandatory where the judge has discretion as to the sentence to be imposed, the *Pearce* court indicated that the judge will use information from many sources when resentencing. Those sources include, but are not limited to, evidence from the second trial, a new pre-sentence investigation and the defendant's prison record. We have held that:

"Sole responsibility for sentencing rests with the trial judge and in the absence of clear abuse of discretion, his sentence is valid. * * * An abuse of discretion is characterized by capriciousness or arbitrariness or by a failure to conduct an adequate investigation into the facts necessary for an intelligent exercise of the court's sentencing power." *State v. Ethington*, 121 Ariz. 572, 574, 592 P.2d 768, 770 (1979) (citations omitted).

We perceive no "capriciousness or arbitrariness" in the instant case. The trial judge had the benefit of a lengthy trial in which to observe the appellant and hear evidence as to his personal history. She had the assistance of appellant's rebuttal of the pre-sentence report addendum, and at the hearing on the motion for modification of sentence, she had the benefit of lengthy testimony regarding appellant's behavior and character during the four years between trials. We hold that there was no abuse of discretion and that the sentence is valid.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court as to Count I (murder, second degree) is reversed and remanded for proceedings consistent with this opinion. The judgment of the trial court as to Count II (assault with a deadly weapon), Count III (unlawful offer to sell narcotics) and Count IV (unlawful possession of a narcotic drug for sale) is affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.