NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

QUINTON OMAR GRIER, *Appellant.*

No. 1 CA-CR 19-0092

FILED 5-7-2020

Appeal from the Superior Court in Maricopa County
No. CR2017-121753-001
The Honorable Michael W. Kemp, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jennifer L. Holder
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mikel Steinfeld
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the decision of the Court, in which Judge Jennifer B. Campbell and Vice Chief Judge Kent E. Cattani joined.

**M c M U R D I E**, Judge:

**¶1**          Quinton Omar Grier appeals from his convictions and sentences for one count of arson of an occupied structure and six counts of endangerment. We affirm Grier's convictions and sentences but modify the sentencing minute entry to reflect the correct statute under which he was sentenced.

## FACTS[1] AND PROCEDURAL BACKGROUND

**¶2**          The circumstances underlying this case arose out of an intensifying conflict between Grier and his extended family in the spring of 2017. During this period, Grier's great-aunt Dorothy was in the hospital recovering from a heart attack. Several members of her immediate family, including her daughter and son, Del and Eric, lived in or frequently visited Dorothy's home to tend to the house and care for her husband, Robert, who was severely disabled.[2]

**¶3**          On May 10, 2017, Del returned to her parents' home to find that Grier had started a fire in the backyard and burned several documents and other items. Del confronted Grier about the burned things, and the argument escalated into Grier chasing Del around the front yard. During the altercation, Grier threatened to kill the family. The police eventually removed Grier from the premises.

---

[1]     We view the facts in the light most favorable to upholding the verdicts and resolve all reasonable inferences against the defendant. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

[2]     We refer to the individuals living and visiting Dorothy's home collectively as "the family."

¶4        Early the next morning, May 11, Del left the home to visit her mother. Del's three daughters, Alonnie, Elysha, and Dorothy, remained with Robert, Eric, his wife Leslie, and Elysha's one-year-old son Jeremiah. While Leslie was preparing breakfast for Eric and Robert, she heard a knock on the locked security gate covering the house's open front door. Leslie went to answer the door and realized it was Grier, who requested to be let in. Leslie shut the front door, locked it, and told Eric that Grier had returned. Eric called the police.

¶5        While Eric contacted the police, Alonnie, Dorothy, and Elysha were talking on a couch in the entertainment room, located at the back of the house. Through a large window facing the house's back patio, Alonnie and Elysha saw Grier enter the backyard. Grier attempted to open the back-patio door, but it was locked. After loitering on the back patio for a time and smoking a cigarette, Grier left the backyard through a gate to an alley behind the home with one of the family's dogs, a German Shepard named Duke, in tow. Worried that Grier might harm Duke, the sisters opened the back-patio door and called for the dog. Duke ran towards the house with Grier following close behind. As soon as Duke was safely in the house, Dorothy shut and locked the door before Grier could enter.

¶6        As Alonnie and Elysha watched through the back-patio window, Grier, shouting obscenities, retrieved a bottle of lighter fluid from a grill area nearby. Grier poured the lighter fluid over a group of bins and a dresser positioned beneath the back-patio window. Grier then lit the lighter-fluid-soaked bins and dresser, which immediately erupted into flames.

¶7        The fire on the back patio proliferated. Soon, the back-patio window shattered, causing flames and smoke to pour into the house. As the fire spread into the entertainment room, Dorothy scrambled to retrieve Robert, while Alonnie, Leslie, and Elysha—with Jeremiah in her arms—escaped out the front door and into the street. Elysha left Jeremiah with Alonnie and Leslie and ran back into the house to help Dorothy, who had managed to drag Robert out of his bedroom. Together, the sisters moved Robert onto the front patio of the house. Del rushed home after receiving a frantic phone call from Alonnie, stating that "Quinton's burning the house."

¶8        Police officers and firefighters arrived to battle the fire and assisted the family in getting to safety. While putting out the fire, firefighters rescued Eric, who had injured himself and become trapped in

3

the backyard while trying to put out the fire. Grier was initially nowhere to be found, but police later arrested him at another family member's home.

¶9        After the fire was extinguished, fire investigator JT Thomas and Captain Michael Duffy of the Phoenix Fire Department investigated the circumstances of the fire. As part of their investigation, Thomas and Duffy called David Zehring, a fire investigator and accelerant-detection-canine handler. Zehring brought Spring, an accelerant-detection canine, to the scene and ran her around the outside of the home. Spring "alerted" to the presence of ignitable liquids in seven areas around the backyard and back patio. After Grier's arrest, Spring also alerted on Grier, and Grier's clothes were taken as evidence. Subsequent laboratory testing of burned-debris samples collected from the locations where Spring alerted confirmed the presence of ignitable-liquid residue where the May 10 fire occurred and in the area beneath the back-patio window. The testing could not confirm the presence of ignitable liquid residue on the other five debris samples or Grier's clothes.

¶10        The State charged Grier with one count of arson of an occupied structure, a class 2 felony, and six counts of endangerment, class 6 felonies, for the May 11 fire, and one count of reckless burning, a class 1 misdemeanor, for the May 10 fire. The State also alleged that the arson and endangerment counts were dangerous offenses. The superior court conducted a six-day trial, during which the State called Del, Alonnie, Elysha, and Leslie to testify to the events of the two fires. The State also called Zehring, as both an expert and fact witness, and Duffy to testify concerning the fire investigation and the evidence collected. Grier elected not to testify in his defense, but called David Smith, a former fire investigator, to testify about alleged deficiencies in the fire investigation and posit an alternative potential origin point for the May 11 fire.

¶11        The jury ultimately convicted Grier of the arson and endangerment counts related to the May 11 fire but acquitted him of the reckless burning count for the May 10 fire. After an aggravation trial, the jury found that the State proved at least two aggravating factors regarding each count.

¶12        At sentencing, the court found that Grier was a category-three repetitive offender based upon his prior felony convictions, Ariz. Rev. Stat. ("A.R.S.") § 13-703, and that the maximum sentence for each count was appropriate. The court sentenced Grier to 28 years' imprisonment for the arson count and 4.5 years' imprisonment for the six endangerment counts and ordered that all sentences run concurrently, with 632 days' presentence

incarceration credit. However, the minute entry documenting the sentencing hearing incorrectly stated that Grier had been sentenced under A.R.S. § 13-704, the sentencing statute for dangerous offenses. Grier appealed, and we have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### A. The Superior Court Erred by Failing to Exclude the State's Expert from the Courtroom during the Defense Expert's Testimony, but the Error Was Harmless Beyond a Reasonable Doubt.

¶13        At the beginning of the fourth day of trial, the court permitted the defense's expert witness, Smith, to testify out of order. The State requested that the court allow Zehring to stay in the courtroom and observe Smith's testimony. Grier objected to Zehring being present during Smith's testimony, stating the rule on the exclusion of witnesses was in effect and arguing that Zehring might "correct his testimony" concerning the investigation based on what he heard Smith say. Without requiring the State to make any further showing, the court overruled Grier's objection and permitted Zehring to observe Smith's testimony.

¶14        Citing Arizona Rule of Evidence ("Evidence Rule") 615 and Arizona Rule of Criminal Procedure ("Criminal Rule") 9.3, Grier argues the superior court was required to honor his request to exclude Zehring from Smith's testimony, and its failure to do so was error. Grier further contends that according to *State v. Roberts*, 126 Ariz. 92, 94 (1980), the superior court's error gave rise to a presumption of prejudice. Grier concludes this presumption cannot be rebutted in his case because: (1) the modifications Zehring made to his testimony gave the State an advantage by allowing it to bolster his credibility; and (2) there is no way "to determine what other ways Zehring modified his testimony to become more responsive."

¶15        Evidence Rule 615 provides: "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony," subject to five enumerated exemptions. Of these exemptions, only one is relevant to this appeal—Evidence Rule 615(c), which states that "a person whose presence a party shows to be essential to presenting the party's claim or defense" may not be excluded. Similarly, Criminal Rule 9.3(a)(1) provides: "The court may, and at the request of either party must, exclude prospective witnesses from the courtroom during opening statements and other witnesses' testimony."

**¶16**        Evidence Rule 615 "does not differentiate between types of witnesses[;] it applies to both expert and fact witnesses." *Spring v. Bradford*, 243 Ariz. 167, 171, ¶ 15 (2017). In *Spring*, the superior court found the defendant's counsel violated the rule by providing its expert transcribed trial testimony of the plaintiff's expert before testifying. *Id*. at 171, ¶ 16.

**¶17**        In *State v. Roberts*, our supreme court considered how to evaluate the prejudicial effect of the superior court's failure to honor a mandatory request to exclude a *fact* witness invoked under Criminal Rule 9.3(a). 126 Ariz. at 94. The court first acknowledged that a defendant must be prejudiced by such error and that in some cases, the examination of the record can lead a reviewing court "to conclude with assurance that a defendant was definitely not prejudiced by the failure to exclude." *Id.* In such cases, the court concluded, "reversal is inappropriate." *Id.* However, because proving prejudice resulting from a failure to exclude is inherently difficult, the court concluded that a "rule requiring an actual showing of prejudice works an injustice," and held "that failure to honor an exclusionary request is presumed prejudicial unless the absence of prejudice is clearly manifest from the record." *Id.* Thus, under *Roberts*, the erroneous denial of a motion to exclude a fact witness requires that a defendant's conviction "be reversed unless scrutiny of the record reveals that the court's denial of his motion to exclude . . . did not prejudice him in any way." *Id.*

**¶18**        In *Spring*, the court noted that "violations involving fact witnesses are more likely to be prejudicial than violations involving expert witnesses." 243 Ariz. at 172, ¶ 21. Therefore, the *Spring* court had "no reason . . . to revisit [the *Roberts*] holding because [it found] that case materially distinguishable," as *Spring* pertained to a violation involving an expert witness and caused by a party, not the court. *Id*. at 171, ¶ 19. But the court rejected applying a presumption-of-prejudice standard for a rule violation in a civil case for an expert witness when the source of the error was a party. *Id.* at ¶ 20.

**¶19**        We need not decide whether *Roberts*' presumption of prejudice applies in a criminal case when the superior court errs by allowing an expert witness to violate the rule. Although it used slightly different verbiage, *Roberts* stands for the principle that whenever the superior court fails to honor a properly made request to invoke the rule, the reviewing court must reverse unless the State proves the resulting error was harmless. In other words, in determining whether it is "manifest from the record" that a defendant was not prejudiced "in any way," *Roberts*, 126 Ariz. at 94, we must consider whether "we can say, beyond a reasonable

doubt," that the superior court's erroneous failure to exclude witnesses "did not contribute to or affect the verdict," *State v. Bible*, 175 Ariz. 549, 588 (1993). "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (alteration in original) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

¶20　　　　Reading *Roberts* in this way comports with the view of the federal circuits who have adopted a similar test to evaluate the failure to honor a request to invoke the rule of exclusion under Federal Rule of Evidence 615, which mirrors Arizona's Evidence Rule 615. *See, e.g.*, *United States v. Jackson*, 60 F.3d 128, 136–37 (2d Cir. 1995) (failure to exclude witness under Federal Rule 615 requires reversal "unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves harmless error"); *United States v. Pulley*, 922 F.2d 1283, 1286 (6th Cir. 1991) ("There is no strict requirement that the defendant prove prejudice in a situation such as this, but we nevertheless remain bound by the harmless error rule."); *United States v. Farnham*, 791 F.2d 331, 335 (4th Cir. 1986) ("Although Rule 615 does not require that [the defendant] show prejudice, we remain bound by the harmless error rule."); *see also State v. Winegardner*, 243 Ariz. 482, 485, ¶ 8 (2018) ("When an Arizona evidentiary rule mirrors the corresponding federal rule, we look to federal law for guidance.").

¶21　　　　We are convinced beyond a reasonable doubt that, given the overwhelming evidence of guilt presented by the State in this case, any modifications Zehring may have made to his testimony as a result of the court's erroneous refusal to exclude him did not contribute to or affect the verdict. *See State v. Anthony*, 218 Ariz. 439, 446, ¶ 41 (2008) ("We can find error harmless when the evidence against a defendant is so overwhelming that any reasonable jury could only have reached one conclusion."); *Bible*, 175 Ariz. at 588–90 (erroneous admission of DNA evidence was harmless in light of overwhelming evidence of guilt).

¶22　　　　Contrary to Grier's assertions on appeal, this case was not, "[a]t its core, . . . a battle of the experts." Zehring's testimony was merely ancillary to the more compelling evidence presented by the State in this case: Alonnie's and Elysha's eyewitness accounts of Grier starting the fire on the back patio and of that fire spreading into the home. Perhaps if Alonnie's and Elysha's testimony at trial had substantially differed or if no independent corroborating evidence existed to buoy the veracity of their accounts, we might find it challenging to say Zehring's testimony did not affect the verdict. But the sisters' testimony concerning the events of the

May 11 fire was not only corroborated by the substantial similarities between their stories, but also by Leslie's account of the circumstances leading up to and immediately after Grier set fire to the containers on the back patio. The reliability of their respective accounts was further bolstered by Del's account of Alonnie's panicked call on May 11, identifying Grier as the perpetrator and the content of recorded 911 calls made by the family and 911 call logs from May 11, which the State submitted into evidence. And the line to inarguable evidence of guilt was crossed when laboratory testing confirmed the presence of ignitable liquid residue consistent with lighter fluid in samples collected from the exact location where Alonnie and Elysha claimed Grier poured lighter fluid.

¶23 Against the overwhelming weight of this evidence, Grier offered only two theories of innocence. First, he claimed that he was never present at the victims' home on May 11. And second, Grier argued that, based on Smith's review of photographs taken at the scene, the area of origin and cause for the May 11 fire could not be identified, and an allegedly malfunctioning electrical outlet might have been another possible origin point. But crediting the theory that Grier was not present would have required the jury to completely ignore or discount three separate eyewitness accounts identifying Grier at the home on May 11. Indeed, there was no question as to the identity of the individual Alonnie, Elysha, and Leslie saw. Grier was, after all, a member of their family. And Smith's testimony concerning the investigation was thoroughly refuted by the testimony of Captain Duffy, who testified, based on his observations of the scene of the May 11 fire, that: (1) all the evidence placed the area of origin of the fire where Alonnie and Elysha witnessed Grier pour lighter fluid; and (2) the investigation had ruled out other possible points of origin such as the electrical outlet discussed by Smith.

¶24 The properly admitted evidence, in this case, leads us to an inescapable conclusion: Grier started the May 11 fire and, in doing so, committed the crimes charged in this case. Based on the overwhelming evidence of guilt, we are convinced beyond a reasonable doubt that the guilty verdicts here were not affected by any improper modification Zehring made to his testimony. Thus, we conclude that it is manifest from the record, under the circumstances of this case, that the erroneous denial of Grier's motion to exclude Zehring did not prejudice him in any way.

**B.** **The Court Did Not Abuse its Discretion by Permitting a Demonstration of Spring's Training and Abilities.**

¶25        After Smith completed his testimony and just before Zehring was set to testify, the State requested that Zehring be permitted to do a short demonstration of Spring's training and ability to detect ignitable liquids. The demonstration would proceed as follows. Outside of Spring's view, Zehring would place a small amount of odorless charcoal lighter fluid on one of three pieces of paper. Zehring would then run Spring by the pieces of paper, and, using the commands and techniques he uses in the field, have Spring attempt to detect the piece of paper with the lighter fluid placed on it. The State explained the demonstration would illustrate how Spring alerts to the presence of ignitable liquids and the techniques Zehring uses to prevent Spring from giving a false alert. The State asserted the demonstration was relevant, "given all the testimony from [Smith] that there's all these false positives. That these food dogs alert if they're hungry. All those types of things." Grier's counsel objected, arguing that the conditions were not the same in the courtroom as on the day of the May 11 fire. The court allowed the State to conduct the demonstration during Zehring's testimony, and the demonstration occurred as described above.

¶26        Grier contends the superior court erred by permitting the demonstration of Zehring and Spring's methods and abilities, arguing that: (1) the court misapplied the law by failing to require the State to show that the demonstration was "substantially similar" to the conditions present at the scene of the May 11 fire; (2) the demonstration was not admissible under that test because the conditions in the court were not similar to the scene of the May 11 fire; and (3) the demonstration should have been deemed inadmissible under Evidence Rule 403. We review the superior court's evidentiary decisions for an abuse of discretion and give "deference to the . . . court's determination regarding relevance." *State v. Dann*, 220 Ariz. 351, 373, ¶ 122 (2009).

¶27        The admissibility of an experiment or courtroom demonstration is governed by Evidence Rules 401 through 403. *See* Ariz. R. Evid. 401 (defining relevant evidence); Ariz. R. Evid. 402 (relevant evidence generally admissible); Ariz. R. Evid. 403 (relevant evidence may be excluded "if its probative value is substantially outweighed by one or more" enumerated factors); *see also State v. King*, 226 Ariz. 253, 256–58, ¶¶ 7-13 (App. 2011) (applying Evidence Rules 401 through 403 to review the admission of videotaped demonstration of force of kick observed by an eyewitness). Generally, "demonstrative evidence is relevant if it illustrates or explains testimony and will be admitted if its probative value outweighs

the danger of unfair prejudice." *State v. Luzanilla*, 176 Ariz. 397, 405 (App. 1993), *vacated in part on other grounds*, 179 Ariz. 391 (1994); *see also* 1 McCormick on Evid. § 217 (8th ed.), Westlaw (database updated Jan. 2020) ("Like a demonstrative aid, if [a demonstration or experiment] assists the trier's understanding, it is relevant."). To avoid the danger of unfair prejudice, Arizona courts have generally required that "the conditions of a demonstration . . . be similar to those being duplicated in order for the demonstration to be admissible." *State v. Mincey*, 130 Ariz. 389, 408 (1981).

¶28 However, "[t]he requirement of similarity is a relative one and should not be over-rigidly applied where the experiment is of substantial enlightening value to the jury." *Mincey*, 130 Ariz. at 408 (alteration in original) (quotation omitted). Thus, when an experiment or demonstration is not "an attempted replication of the litigated event," but is "more in the nature of a demonstration, it is appropriately admitted if it fairly illustrates a disputed trait or characteristic." *Volz v. Coleman Co., Inc.*, 155 Ariz. 563, 565 (App. 1986*), rev'd in part on other grounds*, 155 Ariz. 567 (1987); *see also* 1 McCormick on Evid. § 202.1 ("[T]he similarity requirement either is not applied or is highly diluted when the pretrial experiment does not purport to replicate the essential features of a particular happening."); *id.* § 217 (noting the same substantial similarity principles apply to both in-court and out-of-court experiments). "This is a determination which, absent abuse, is left to the discretion of the trial court." *Mincey*, 130 Ariz. at 408.

¶29 Applying these principles to this case, we conclude the demonstration of Spring's training and abilities was more akin to a general demonstration or the use of a demonstrative aid to illustrate and explain Zehring's testimony than an experiment designed to reenact some aspect of Zehring's investigation of the May 11 fire. The State explained that the purpose of the demonstration was to illustrate how Spring is trained to alert Zehring to the presence of ignitable liquids and the techniques Zehring utilizes to prevent Spring from giving a false alert, not to replicate any event related to the May 11 fire. Therefore, strict adherence to the "substantial similarity" requirement was unnecessary, *Mincey*, 130 Ariz. at 408, and we instead evaluate whether the demonstration was generally relevant, *Luzanilla*, 176 Ariz. at 405, and whether it "fairly illustrate[d] a disputed trait or characteristic," *Volz*, 155 Ariz. at 565.

¶30 The demonstration was relevant because it illustrated and explained Zehring's testimony and aided the jury in understanding how Spring alerts to the presence of ignitable liquids and how Spring's training limits the possibility of false alerts. As for whether the demonstration

"fairly illustrate[d] a disputed trait or characteristic," although we agree with Grier that the State's characterization of Smith's testimony at trial was perhaps exaggerated, Smith certainly put the evidentiary value of accelerant-detection-canine alerts in dispute. During direct examination, Smith discussed the standards of the National Fire Protection Association ("NFPA") concerning the use of accelerant-detection canines and the history of the standards' development extensively. In doing so, Smith indicated that: (1) the NFPA developed the standards after several criminal convictions were obtained based solely on canine alerts, which Smith characterized as a "big problem"; (2) the NFPA standards stated, "in a nutshell," that the "canine's mere alert can't be used as evidence of an ignitable liquid"; and (3) at least one of the reasons underlying the decision for the NFPA standards to state that an alert cannot be used as evidence of an ignitable liquid was the potential for false positives.

¶31        The purpose of this testimony was to undermine the creditability of Zehring's testimony by calling into question the reliability and evidentiary value of an accelerant-detection canine's alerts. It was not an abuse of its discretion for the superior court to allow the State to introduce a demonstration illustrating Spring's training and abilities to assist the jury in understanding and better assessing the weight to be given this type of evidence. Indeed, our supreme court has endorsed the use of demonstrations to meet the foundational requirements for admission of canine-based tracking or identification evidence. *State v. Roscoe*, 145 Ariz. 212, 221 (1984) ("[C]are should be taken to see that the foundation does indicate that the results from use of the dog are reliable. Demonstrations, in the courtroom or on film, to verify the dog's abilities might be advisable.").

¶32        Finally, we note that the circumstances surrounding the introduction of the demonstration largely mitigated any potential unfair prejudice or confusion resulting from its admission. The demonstration was conducted before Zehring testified to his investigation of the May 11 fire, and upon cross-examination, Zehring readily acknowledged the conditions in the courtroom were not the same as those present at the May 11 fire. Accordingly, the superior court did not abuse its discretion by permitting the demonstration.

## C. The Prosecutor's Statements During Closing Arguments Did Not Amount to Prosecutorial Error Requiring Reversal.[3]

**¶33** Finally, Grier argues that several statements made by the prosecutor during closing arguments constituted error because they denied him due process and a fair trial. "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Goudeau*, 239 Ariz. 421, 465, ¶ 193 (2016) (quoting *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998)). "We will reverse a conviction for prosecutorial misconduct only if (1) the prosecutor committed misconduct and (2) a reasonable likelihood exists that the prosecutor's misconduct could have affected the verdict." *State v. Benson*, 232 Ariz. 452, 463, ¶ 40 (2013). "In determining whether an argument is misconduct, we consider two factors: (1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that the jurors were in fact influenced by the remarks." *Goudeau*, 239 Ariz. at 466, ¶ 196 (quotation omitted).

**¶34** "The standard of review applicable to each claim depends upon whether [Grier] objected to the alleged misconduct in the superior court. If [he] objected, we review for harmless error, but if [he] failed to object, we review only for fundamental error." *State v. Arias*, ___ P.3d ___, 2020 WL 1429876, at *5, ¶ 31 (Ariz. App. Mar. 24, 2020). As stated above, "[h]armless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005). Fundamental error review, on the other hand, places the burden on Grier to prove that: (1) trial error exists; (2) the error went to the foundation of the case, took away a right essential to his defense, or was so egregious that Grier could not have possibly received a fair trial; and (3) the fundamental error caused him prejudice. *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). We must

---

3       In *In re Martinez*, 2020 WL 2071939, at *9, ¶ 47 (Ariz. Sup. Ct. Apr. 30, 2020), the court stated that "when reviewing the conduct of prosecutors in the context of 'prosecutorial misconduct' claims, courts should differentiate between 'error,' which may not necessarily imply a concurrent ethical rules violation, and 'misconduct,' which may suggest an ethical violation." The alleged errors in this decision are not ethical violations and will, therefore, be referenced as prosecutorial error.

also address the cumulative effect of the alleged misconduct. *State v. Morris*, 215 Ariz. 324, 335, ¶ 47 (2007).

### 1. The Prosecutor's Comparison of Grier to a "Big Bad Wolf" Was Permissible.

¶35      Grier first argues the prosecutor improperly likened him to an animal in the following statement: "And then Grier comes running from the back gate like a big bad wolf he's at the glass door and he's telling the girls to let him in." Grier asserts labeling him as "a big bad wolf" offered "nothing of substance" and was "meant to encourage the jury to rest a decision upon emotion rather than reason." Because Grier did not object to this statement at trial, we review for fundamental error.

¶36      Our supreme court recently addressed a similar argument in *State v. Riley*, 248 Ariz. 154, 192–93, ¶ 153 (2020). There, the court assessed whether a prosecutor's statement during closing arguments that the defendant was "like a jackal standing over a fresh kill," and "picked [the victim] clean from his clothing" constituted error. *Id.* The court held the statement was within the range of permissible argument because "unflattering analogies during closing arguments that are supported by facts in common knowledge are permissible." *Id.* Because jackals are commonly known as "opportunistic, predatory animals," the court concluded that comparing the defendant's act of stealing the victim's clothing to a jackal's actions was not improper. *Id.*; *see also Goudeau*, 239 Ariz. at 466, ¶¶ 195–97 (prosecutor's comparison of a defendant to a "wolf in sheep's clothing" during closing argument was consistent with the evidence and therefore permissible).

¶37      As in *Riley*, the prosecutor's comparison of Grier to a "big bad wolf" here was an analogy supported by the evidence presented at trial and facts in common knowledge. It is common knowledge that a "big bad wolf" is the villain of *The Three Little Pigs*, a famous fairy tale in which a wolf requests to be let into the homes of three pigs and, when rebuffed, destroys all but one of the pigs' homes. *See* Joseph Jacobs, *The Story of the Three Little Pigs*, *in* The Annotated Classic Fairy Tales 206, 206–11 (Maria Tatar ed., 2002). There was substantial evidence that on the morning of the May 11 fire, Grier demanded to be let into the family's home. When the family refused, he made multiple uninvited attempts to enter the family's home, including chasing one of the family's dogs into the house. Comparing Grier's conduct to the antagonist of this well-known fairy tale was consistent with the evidence and not improper. Thus, Grier has not shown

this statement constituted error, let alone error rising to the level of fundamental, prejudicial error.

**2.      The Prosecutor's Invitation for the Jurors to Place Themselves in Del's Position on the Day of the May 10 Fire Was, At Most, Harmless Error.**

¶38      When summarizing the facts surrounding the May 10 fire during his closing argument, the prosecutor made the following statement:

> And you saw the way that Del . . . reacted when she saw those items in the fire. She is a daughter and she sees her mom's recipes, her mom's mail all burned in the fire while the mom is away in the hospital. *How would any of you . . . have reacted in that situation?*

(Emphasis added.) Grier objected, but the court overruled the objection. Grier now argues this statement constituted error by inviting the jurors to place themselves in Del's position, thereby improperly appealing to their sympathy for Del and fear or anger towards Grier. Because Grier objected to this statement at trial, we apply harmless-error review.

¶39      Although prosecutors have "wide latitude in closing argument," it is improper to "make arguments that appeal to the jury's fear or passion. This includes inviting jurors to place themselves in the victim's position because doing so plays on the jurors' fear of the defendant or sympathy for the victim." *State v. Lynch*, 238 Ariz. 84, 100, ¶ 48 (2015) (citation omitted), *rev'd on other grounds*, 136 S. Ct. 1818 (2016); *see also Morris*, 215 Ariz. at 337, ¶ 58. "Although highly misleading statements might sometimes taint a trial, 'cautionary instructions by the court generally cure any possible prejudice' from statements by counsel because juries are presumed to follow the trial court's instructions." *State v. Ovante*, 231 Ariz. 180, 186, ¶ 24 (2013) (quoting *State v. Manuel*, 229 Ariz. 1, 6, ¶ 24 (2011)).

¶40      Here, we need not address whether the prosecutor's statement amounted to error because even assuming it did, we are firmly convinced the resulting error was harmless. The prosecutor made the statement while summarizing the circumstances surrounding the May 10 fire, and Grier was acquitted of the only charge arising from that event. It is difficult to conceive of more concrete evidence that the jurors were not unduly influenced by the prosecutor's statement than the *jury's decision to acquit* Grier of the very charge the statement concerned. Grier nevertheless contends the statement caused him harm by leaving the jurors with the

impression that such considerations were proper in reaching their verdict. But the superior court instructed the jurors that they must not be influenced by sympathy or prejudice and that the lawyers' statements during closing arguments were not evidence. We presume the jurors followed the court's instructions. *State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006). We conclude this statement did not constitute reversible error.

### 3. The Prosecutor's Use of "We Know" Statements Was Not Fundamental, Prejudicial Error.

¶41 Next, Grier asserts the prosecutor improperly vouched for the strength of the State's evidence during his closing argument by using the phrase "we know" while describing and summarizing the evidence. Grier identifies three such "we know" statements and contends the prosecutor utilized these statements to place the prestige of the government behind the State's evidence. The statements identified are as follows:

> You know, you had this patio table, this is where the defendant took a moment to lay his backpack and then take out a lighter and Elysha saw him light a cigarette, so *we know* that on the morning of May 11th, he had a lighter at some point.
>
> \* \* \*
>
> And Elysha saw him drop a flaming object onto the lighter fluid. And *we know* that this whole fire wouldn't have happened but for someone introducing . . . flame to all this lighter fluid.
>
> \* \* \*
>
> The fire was started and it moved quickly. It caused explosions according to the girls. *We know* that they're talking about the glass blowing up.

(Emphasis added.) Because Grier did not object to these statements at trial, he bears the burden to demonstrate fundamental, prejudicial error.

¶42 "Prosecutorial vouching takes two forms: '(1) where the prosecutor places the prestige of the government behind its [evidence] [and] (2) where the prosecutor suggests that information not presented to the jury supports the [evidence].'" *Newell*, 212 Ariz. at 402, ¶ 62 (alterations in original) (quoting *State v. Vincent*, 159 Ariz. 418, 423 (1989)).

¶43 The statements at issue here did not result in fundamental error. The first statement did not place the prestige of the government behind the evidence or suggest knowledge on the part of the government untethered to the evidence. Instead, the statement specifically referenced the reason the government (and presumably the jurors) knew that Grier had a lighter—*i.e.* "Elysha saw him light a cigarette." The second statement (the whole fire "wouldn't have happened but for someone introducing . . . flame") similarly did not suggest the government was aware of undisclosed evidence supporting a theory, and instead was arguably simply an appeal to the jurors to use common sense in deciding how a fire happens. Finally, the third statement tied two of the witnesses' testimony to their knowledge of circumstances of the fire and did not suggest special knowledge by the government. Accordingly, Grier has not established that the statements constituted vouching.

¶44 Moreover, even assuming the prosecutor should not have used the phrase "we know," any possible error was harmless. Our supreme court recently addressed the dangers of prosecutorial vouching presented by using "we know." *See State v. Acuna Valenzuela*, 245 Ariz. 197, 218, ¶¶ 83–85 (2018). In *Acuna Valenzuela*, the court addressed, *inter alia*, whether a prosecutor's statement that "[w]e know that the defendant had gunshot residue on him not just because he had bad luck, but because he's the one that used the gun to cause all of this damage," constituted improper vouching. *Id.* at ¶ 83. The court found the prosecutor's use of "we know" statements concerning because "there is a fine contextual line between the use of 'we know' inclusively, i.e., to describe evidence and outline inferences from that evidence with the jury, and the use of 'we know' in an exclusive manner, i.e., to refer to the State collectively." *Id.* at ¶ 85. But despite these concerns, the court did not conclude that the use of the word "we," by itself, "rises to the level of fundamental, prejudicial error." *Id.*

¶45 Grier argues that the statements here cross the line to error, and this error rose to the level of fundamental, prejudicial error because at least two of the statements concerned a critical factual dispute; the origins of the May 11 fire. But the statements at issue in *Acuna Valenzuela* also involved a critical factual dispute; the identity of the gunman who shot the victim. 245 Ariz. at 218, ¶ 83. Nevertheless, the court still concluded that the use of the pronoun "we" alone did not "rise[] to the level of fundamental, prejudicial error." *Id.* at ¶ 85. Even if we were to credit Grier's claim that the prosecutor's use of "we" placed the prestige of the government behind the State's evidence, we can see no basis on which to distinguish the circumstances here from those present in *Acuna Valenzuela*.

**¶46** Moreover, to the extent any vouching error was caused by these statements, it was rendered harmless by the court's instruction to the jurors that the lawyer's arguments were not evidence. *See State v. Payne*, 233 Ariz. 484, 512, ¶ 109 (2013) ("When improper vouching occurs, the trial court can cure the error by instructing the jury not to consider the attorneys' arguments as evidence."). Grier has not carried his burden of demonstrating the prosecutor's use of "we know" statements was a fundamental, prejudicial error.

### 4. Grier Has Not Shown that the Cumulative Effect of Alleged Prosecutorial Error Caused Him Prejudice.

**¶47** Finally, we address whether Grier has shown that the alleged instances of prosecutorial error here resulted in cumulative error necessitating reversal. We may reverse a conviction due to prosecutorial error if "the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and 'did so with indifference, if not a specific intent, to prejudice the defendant.'" *Morris*, 215 Ariz. at 335, ¶ 47 (quoting *Hughes*, 193 Ariz. at 80, ¶ 31).

**¶48** Other than a passing reference at the beginning of the portion of his brief addressing prosecutorial error, Grier makes no argument concerning the cumulative effect of the alleged error here. Our review of the alleged incidents of error also did not reveal that the prosecutor "intentionally engaged in improper conduct," or did so "with indifference" or "specific intent" to cause Grier prejudice. *See Morris*, 215 Ariz. at 335, ¶ 47. Grier has, therefore, failed to demonstrate that "the cumulative effect of any instances of misconduct in his trial 'so permeated and infected his trial as to render it unfair.'" *Acuna Valenzuela*, 245 Ariz. at 224, ¶ 120 (quoting *State v. Hulsey*, 243 Ariz. 367, 394, ¶ 123 (2018)).

### D. We Correct Grier's Sentence to Reflect He Was Sentenced Under A.R.S. § 13-703(J).

**¶49** Both Grier and the State agree that although the minute entry addressing Grier's sentencing reflects the correct duration of each sentence Grier received during the court's oral pronouncement of sentence, it does so under the wrong sentencing scheme. At sentencing, the court stated that it found Grier was a category three repetitive offender under A.R.S. § 13-703(J) and sentenced him to the maximum term of imprisonment for each conviction under that statute. The minute entry of sentencing, however, states Grier was sentenced to either the presumptive or minimum

terms of imprisonment set forth by A.R.S. § 13-704(C) and (E), which are part of the sentencing scheme for dangerous offenses.

**¶50**        "When a discrepancy between the trial court's oral pronouncement of a sentence and the written minute entry can be clearly resolved by looking at the record, the '[o]ral pronouncement in open court controls over the minute entry.'" *Ovante*, 231 Ariz. at 188, ¶ 38 (alteration in original) (quoting *State v. Whitney*, 159 Ariz. 476, 487 (1989)). If the intended sentence can be identified, this court can order the minute entry corrected. *See id.*; *State v. Veloz*, 236 Ariz. 532, 538, ¶ 21 (App. 2015). After reviewing the transcript of sentencing here, we agree with the parties that the superior court intended to sentence Grier as a category-three repetitive offender and to impose the maximum sentence for each conviction under that sentencing scheme. Accordingly, we correct the minute entry concerning Grier's sentence to reflect that Grier was sentenced under A.R.S. § 13-703(J).

## CONCLUSION

**¶51**        We affirm Grier's convictions and sentences as corrected.



AMY M. WOOD • Clerk of the Court
FILED:    AA